## Eckhart & Swan Milling Co. v. William C. Schaefer, Adm'r, etc.

1. JURORS—*Examination of, in Personal Injury Cases.*—In the examination of jurors in personal injury cases it is error to permit counsel for the defense to ask questions which allow the jurors to take into consideration the fact that the defendant is insured in a casualty company against loss from accidents.

2. PRACTICE—*Asking Instructions Unnecessary After Excepting to the Admission of Evidence.*—A party after having properly preserved exceptions to the improper statements of counsel in the examination of the jurors is not bound to ask for an instruction governing the effect of such statements.

3. ORDINARY CARE—*In the Adoption of Appliances.*—An employer can not be required to adopt any particular method of construction, or any particular contrivance or device in order to be in the exercise of ordinary care.

**Trespass on the Case.**—Death from alleged negligence. Appeal from the Superior Court of Cook County; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in this court at the October term, 1901. Reversed and remanded. Opinion filed April 10, 1902.

O. W. DYNES, attorney for appellant.

. JOHN R. GEARY and GEORGE W. PLUMMER, attorneys for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

Appellant is the owner of a grain elevator in the city of Chicago. The first or ground floor is about twelve feet in height. The second floor contains a number of wheat bins. The wheat is taken from these bins through openings in the bottom of the bins. There is a slide door in the bottom of each bin which, when pulled out, allows the grain to pass through, when it is transmitted by means of a spout or trough to a conveyor, by means of which last it is conveyed to railroad cars. The openings in the bottom of the bins are about a foot square, and are boarded on all sides, the boarding extending below the bottom of the bins. These extensions of the boarding of the

bins are called stubs. The spout or trough through which the grain passes from the bottom of the bin to the conveyor is made of seven-eighths inch lumber. It has a bottom and two sides, the top being open, and is rectangular, as are the stubs of the bins, and is about eight or nine feet in length. The upper part of the spout is constructed so as to fit over the stub or extension downward of the boarding of the bins, and is so constructed otherwise that it extends in a slanting direction to the conveyor. A spout can be taken down and removed from bin to bin, as may be convenient. A spout, when in place, is supported by a wooden prop two by four inches in size, of sufficient length to reach from the floor to the spout, with a piece of forked wrought metal, sharp pointed at each end, one end resting on the floor and the other up against the spout. This support is called a spear. At the time of the accident the lower end of the spout, at the place where the accident occurred, rested on some other spouts coming from a different direction. Between the ground floor and the ceiling of that floor a power shaft extended along the building, about ten feet above the floor, and about two feet below the ceiling, and was held in place by hangers, which were fastened to the timbers which supported the second floor. This shaft was operated by steam, and transmitted the power to the conveyors, machinery and electric dynamos. The distance between the bottom of the bin, where the accident occurred, and the shafting, is variously estimated by the witnesses at from two feet, to two feet eight inches.

Appellee's intestate, Charles Grossman, was a laborer in the building, and his duty was, among other things, to take down and put up spouts; and Hewitt, superintendent of the building and a witness for appellee, testified that appellee's intestate told him that he was a carpenter.

On March 2, 1898, grain was being taken from the bins, and the spout attached to the bin where the accident occurred did not fit well over the stub of the bin, and Hewitt, the superintendent, said to Charles Grossman, appellee's intestate, " We will have to fix the corner of that spout so the

wheat won't run over; we will have to take a little corner off it, off here, so it will fit up better and won't spill the grain over." Grossman then got a step ladder which was about fourteen feet away from where he subsequently placed it to fix the spout, placed it, and ascended to where the spout joined the stub, taking a saw with him. While there, and sawing on a corner of the spout, his clothes were caught by the shaft and he received injuries which resulted in his death. The spout which he was sawing fell from the stub at the time of the accident. It does not appear from the evidence what corner of the spout he was sawing, or exactly where he was with reference to the shaft.

The jury rendered a verdict for appellee for the sum of $3,500, and judgment was rendered on the verdict.

In view of the conclusions we have reached, we do not find it necessary to make a more extended statement of the facts. In the examination of the jury the following occurred, Mr. J. R. Geary and Mr. George W. Plummer appearing on behalf of the plaintiff, and Mr. O. W. Dynes appearing on behalf of the defendant.

During the examination of juryman F. H. Knapp, the following questions were asked :

" Mr. Geary : Do you know any one connected with the Fidelity and Casualty Company ? A. I do not.

Q. I may state, gentlemen, that the Fidelity and Casualty Company are defending this case.

Mr. Dynes : That is objected to, and I ask that an exception be noted.

The Court : Well, we will go on for the present."

(To which ruling of the court the defendant, by its counsel then and there duly excepted.)

The following questions were asked of juryman Fred J. Colburn :

" Mr. Geary : Do you know anything about this case ? A. No, sir.

Q. I might also state that this case is defended by the Fidelity and Casualty Company of Chicago.

Mr. Dynes : That is objected to."

(Objection overruled. To which ruling of the court, the defendant, by its counsel, then and there duly excepted.)

Eckhart & Swan Milling Co. v. Schaefer.

" Mr. Geary (addressing counsel for defendant): You are the attorney for the Fidelity and Casualty Company, are you not ?

Mr. Dynes : I object to that.

The Court : He may be attorney for a hundred different concerns.

Mr. Plummer : But in this case ?

Mr. Geary : In this particular case ?

Mr. Dynes : I object to that and take an exception."

(To which remark of counsel for plaintiff the defendant, by its counsel, then and there duly excepted.)

" The Court : A man may have more than one client; he usually has.

Mr. Plummer : I mean in this particular case he is the attorney for the Fidelity and Casualty Company.

Mr. Dynes : I object to that and take an exception."

(To which remark of counsel for plaintiff the defendant, by its counsel, then and there duly excepted.)

" The Court : Well, it is you who made the statement.

Mr. Plummer : We will prove it.

Mr. Geary : Mr. Dynes, isn't it a fact that the Fidelity and Casualty Company will pay any judgment rendered in this case ?

. Mr. Dynes : I object to that and ask that an exception be allowed to that inquiry. I am not tendering myself as a juror."

(To which remark of counsel for plaintiff, the defendant, by its counsel, then and there duly excepted.)

" Mr. Geary : Do you know Mr. Dynes here, who sits here, the attorney for the Fidelity and Casualty Company ? A. No, sir. "

(To which remark of counsel for plaintiff, the defendant, by its counsel, then and there duly excepted.)

" Mr. Geary : Do you know any of the officers of the Fidelity and Casualty Company of Chicago ? "

(Objected to. Objection overruled. To which ruling of the court, defendant, by its counsel, then and there duly excepted.)

" A. No, sir.

Q. Do you know Mr. Alexander, the general agent ? A. No, sir."

(Objected to. Objection overruled. To which ruling of the court, defendant, by its counsel, then and there duly excepted.)

" Q. Or Mr. Dynes or Mr. Williams, the attorneys, or any of the parties connected with it ? "

(Objected to. Objection overruled. To which ruling of the court, defendant, by its counsel, then and there duly excepted.)

" The Court : Well, take an exception, Mr. Dynes.

Mr. Geary : For the rest of you gentlemen, I will ask you if any of you know Mr. Dynes or Mr. Williams, or any of the attorneys for the Fidelity and Casualty Company, or if you know Mr. Alexander, the agent, or any of the directors of that company in Chicago? If any of you do, why just indicate it. If any of you gentlemen have had any business dealings with the Fidelity and Casualty Company of Chicago, or if you know of any reason why you could not try this case fairly and impartially and decide it on the evidence presented, and the law presented by the court."

(Objected to. Objection overruled. To which ruling of the court, defendant, by its counsel, then and there duly excepted.)

The following questions were propounded to juryman Simon Frankle by counsel for plaintiff : ,

" Q. Now, this case is defended by the Fidelity and Casualty Company."

(Objected to by counsel for defendant. To which remark of counsel for plaintiff, the defendant, by its counsel, then and there duly excepted.)

" The Court : Take an exception.

Mr. Geary : Do you know their attorney here, Mr. Dynes, or Mr. Williams ? "

(Objected to. Objection overruled. To which ruling of the court, defendant, by its counsel, then and there duly excepted.)

" Q. Do you know Mr. Alexander, the general agent for the Fidelity and Casualty Company? A. No, sir.

Q. Do you know any of the directors or employes of the Fidelity and Casualty Company ? A. No, sir."

The following questions were propounded to juryman Bugbee by counsel for plaintiff :

" Q. Do you know any of the officers or directors of the Fidelity and Casualty Company of Chicago ? A. No, sir, I don't think I do.

Q. Do you know Mr. Alexander, the general agent ? A. No, sir.

Q. Do you know Mr. Dynes or Mr. Williams, attorneys for that company ? "

(Objected to. Objection overruled. To which ruling of

Eckhart & Swan Milling Co. v. Schaefer.

the court, the defendant, by its counsel, then and there duly excepted.)

The following questions were propounded to juryman Clark by counsel for plaintiff :

" Q.   Do you know anybody connected with the Fidelity and Casualty Company of Chicago ?   A.   No, sir.

Q.   Do you know any of the officers or directors or Mr. Alexander, the agent ?   A.   No, sir.

Q.   Or Mr. Dynes here, or Mr. Williams, the attorneys ? "

(Objected to.   Objection overruled.   To which ruling of the court, the defendant, by its counsel, then and there duly excepted.)

It sufficiently appears from the foregoing that the attorneys for the plaintiff (appellee here), not satisfied with asking jurors whether they knew any one connected with the Fidelity and Casualty Company, which question they had the right to ask, for the purpose of a peremptory challenge, and which was not objected to, proceeded further, and stated to the jurors that the Fidelity and Casualty Company was defending the case, and also stated that Mr. Dynes, who is appellant's attorney, was the attorney of the Fidelity and Casualty Company in this case in the trial court.   And the court, by overruling the objections of appellant's attorneys to such statements, stamped the statement with the court's approval, so that they went to the jury with all the force and effect of evidence.   Mr. Dynes was the attorney of record for appellant and the Fidelity and Casualty Company was not a party to the record.   If it were a fact that the Fidelity and Casualty Company was defending the suit, it would not be competent to prove that fact, for the plain reason that such proof would not tend, in any degree, to sustain the issues; it would be totally irrelevant.   It is, therefore, plain that the attorneys, presumably learned in the law, could not have made the statements in question for any legitimate purpose, and while we will not say that they were made for an illegitimate purpose, and to prejudice the jury, we are of opinion that they were well calculated to have that effect. O'Neill Manfg. Co. v. Pruitt, 36 S. E. Rep. 59, Sup. Ct.

Georgia; Sawyer v. J. M. Arnold Shoe Co., 90 Me. 369; Barrett v. Bonham Oil and Cotton Co., 57 S. W. Rep. 603, Court of Civil Appeals of Texas.

In the Maine case, cited *supra*, the court say :

"The defendant corporation was insured against accidents. This fact appeared incidentally in the case, because of a statement in writing from the defendant to the insurance company, which, it was claimed, contained certain admissions of the defendant, and was admitted only for the purpose of showing any admission of the defendant as to how and when the accident happened and whether the defendant was using ordinary care or not."

In his charge to the jury, the justice presiding said :

"Now, it is contended by the plaintiff that the defendant exercised no care; that they trusted to the insurance; and therefore I think it admissible that it should appear that there was an insurance, or that they trusted to one rather than upon any investigation, inquiry or experiment or conduct otherwise of their own. We think that this was error; that while the fact that the defendant was insured against accidents could have no legitimate bearing, it might very naturally have an improper influence upon the jury in passing upon the one question involved— whether or not the defendant had failed to exercise that degree of care which the law required of it. The burden of proving that the defendant had failed in this respect was upon the plaintiff, and we do not think that because the defendant had taken the precaution to be insured against accidents, it could have any influence with the jury in determining that question. It is true, that the fact of insurance might have the effect of lessening the defendant's reason or motive for being careful. But the question was not as to how much or how little motive the defendant had for being careful, but whether or not it had in fact exercised due and reasonable care. We think that to allow juries, in cases of this kind, to take into consideration the fact that an employer was insured against accidents, would do more harm than good, and would increase the already strong tendency of juries to be influenced, in cases of personal injuries, especially where a corporation is defendant, by sympathy and prejudice. It is the opinion of the court, therefore, that upon this point the exception must be sustained."

The Texas case cited *supra*, was a personal injury case,

and the court held that evidence offered by the plaintiff to prove that the defendant was insured against liability for damages, by reason of accidents occurring to its employes, was properly excluded, saying: " It was not relevant or competent to establish any issue in the case."

As before stated, the remarks of the attorneys to the plaintiff, ruled as proper by the court, went to the jurors with at least as great effect as evidence, and we can not overlook the fact that, as said by the Supreme Court of Maine, such remarks, if permitted, " would increase the already strong tendency of juries to be influenced, in cases of personal injuries, especially where a corporation is defendant, by sympathy and prejudice."   We can not say that such was not the effect of the improper statements of appellee's attorney to the jurors.  Appellee's counsel seem to rely somewhat on the fact that they produced and exhibited to the court a letter from appellant's attorney to the appellee, mentioning the injuries and death of appellant's intestate and suggesting a settlement, and a letter in answer thereto, referring the attorney to the Fidelity and Casualty Company.  These letters did not go to the jury, and we are at a loss to understand why they were presented to the court.  They were not at all necessary to entitle appellee's counsel to ask the question which was not objected to, namely, whether any juror knew any one connected with the Fidelity and Casualty Company.

Counsel for appellee say that if their statements to jurors were improper, the attorneys for appellant should have asked an instruction to that effect.  They were not bound so to do, having properly preserved exceptions; and had they done so, it is highly improbable that the court, in view of its deliberate ruling, would have given it, and even if such an instruction had been given, it is very doubtful whether it would have removed the impression made on the minds of the jurors by the improper remarks.

Larz Jensen, a witness for appellee, having stated that he had worked in different mills and had observed the method used in such mills to hold movable spouts in

place, was asked by appellee's attorney to state what the
methods were, and the witness described two methods, the
one by means of a hook, hooked into an eye-bolt in the
spout, and the other by means of a turn-head, which he
described. Objections were made to this testimony, which
were overruled by the court, and exceptions preserved. It
was error to admit the testimony. C. & E. Ill. R. R. Co.
v. Driscoll, 176 Ill. 330, 334; Kehler v. Schwenk, 22 Atl.
Rep. 910, Penn. 1891; C. & E. I. R. R. Co. Finan, 84 Ill.
App. 383, 389.

In the Driscoll case, *supra*, the court, discussing the
question whether the failure to place a butt-post at the end
of a stub-switch in a switch yard, is such a showing of neg-
ligence as should be submitted to a jury, say :

"A railroad company can not be required to adopt any
particular method of construction, or any particular con-
trivance or device, in order to be in the exercise of ordinary
care. Public policy does not require courts to lay down
any rule as to the manner of construction of railroads.
The hazardous character of the business of operating a
railroad, and the danger to life, body and limb of employes
thereon, may well call for specific legislation having for
its object the protection of the person of the employe and
of the traveling public, and yet it is not a question for a
court to submit to a jury whether the manner of construc-
tion of a railroad is proper or not. A verdict is not a
precedent, and is not binding on another jury. One jury
might find the construction a proper one, while another
jury might find it an improper one, and the important
engineering question of the manner of constructing a rail-
road would thus be left to the varying and uncertain opin-
ions of jurors. The only question proper to submit to a
jury in such cases is, whether the premises as they existed
at the time of the injury were reasonably safe."

We doubt whether the reasons for the rule can be more
clearly and concisely stated. Appellee's counsel contend
that the evidence was admissible on the ground that appel-
lant's attorney, in the cross-examination of appellee's wit-
ness, Hewitt, asked Hewitt if the way in which the spout
was fastened was the usual way of fastening it in appel-
lant's line of business, to which question the witness

answered, "Yes, sir." But the difficulty with the testimony of the witness Jensen is that he did not testify, nor was he questioned as to whether the manner in which the spout was fastened was, or not, the usual way. He merely testified that he had seen such spouts fastened in two other ways, which, for aught that appears, may have been exceptions to the usual way. By usual way, is not meant a uniform exceptionless way, but only the general, common or ordinary way. The reasons for the exclusion of particular methods, stated by the court in Railroad Co. v. Driscoll, *supra*, clearly apply to the testimony of Jensen. The evidence shows that appellee's intestate assisted in putting up the spout, and there is no evidence that it was not sufficiently safe for the purpose for which it was used, namely, as a conduit for the passage of the grain from the car to the conveyor.

We find no reversible error in the refusal of instructions asked by appellant's counsel. Inasmuch as the cause must be remanded, we think it inexpedient to express any opinion as to the merits.

Because of the errors indicated, the judgment will be reversed and the cause remanded.